16-3292-cv
*Williams v. Affinion Group, LLC*

# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2017
No. 16-3292-cv

DEBBIE WILLIAMS, Regina Warfel, individually and on behalf of all others similarly situated, Brett Reilly, individually and on behalf of all others similarly situated, Juan M. Restrepo, individually and on behalf of all others similarly situated, Jennie H. Pham, individually and on behalf of all others similarly situated Lucy Schnabel, Brian Schnabel, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

Debra Miller, individually and on behalf of all others similarly situated, William Thompson, individually and on behalf of all others similarly situated, Brittany DiCarolis, Annette Sumlin, Hope Kelm, individually and on behalf of all others similarly situated, Barbara Timmcke, individually and on behalf of all others similarly situated, Edward Schnabel, individually and on behalf of all others similarly situated, David Frankel, individually and on behalf of all others similarly situated,

*Plaintiffs*,

*v.*

AFFINION GROUP, LLC, Apollo Global Management, LLC, Beckett Media LLC, Buy.com, Inc., IAC/InteractiveCorp, PeopleFindersPro, Inc., Shoebuy.com, Inc., Trilegiant Corporation, Wyndham Worldwide Corp.,

*Defendants-Appellees*,

1-800-Flowers.com, Inc., Adaptive Marketing, LLC, Days Inns Worldwide, Inc., Rakuten USA, Inc., Vertrue Inc., Webloyalty.com, Inc., Orbitz Worldwide, LLC, Priceline.com, Inc., TigerDirect, Inc., Bank of America N.A., Wells Fargo Bank, N.A., Citigroup Inc., Capital One Financial Corporation, Chase Bank USA, N.A., Citibank, N.A. Hotwire, Inc., Chase Paymentech Solutions, LLC, United Online, Inc., Classmates International, Inc., FTD Group, Inc., Memory Lane, Inc.,

*Defendants.*

ARGUED: OCTOBER 27, 2017
DECIDED: MAY 7, 2018

Before:　　　JACOBS and LYNCH, *Circuit Judges*, CROTTY, *District Judge*:[1]

Seven former participants in online discount membership programs allege violation of federal privacy statutes and a racketeering conspiracy between online retailers and loyalty club businesses to defraud customers of "membership fees" for rewards programs they unwittingly joined. They allege that Trilegiant Corporation conspired with e-merchant retailers such as Buy.com, Orbitz, and Priceline to enroll the retailers' customers in the discount programs via deceptive post-transaction marketing and datapass techniques. We conclude that, because the appellants fail to raise a material issue of fact as to whether they consented to enrollment in the membership programs, the prohibitions of the Electronic Communications Privacy Act do not apply; and because the appellants identify no actionable fraud, they cannot proceed on a theory of racketeering.

Affirmed.

---

[1] Judge Paul A. Crotty, United States District Court for the Southern District of New York, sitting by designation.

JEFFREY A. LEON (*with* Jamie E. Weiss, Grant Lee, *on the brief*), Quantum Legal LLC, Highland Park, Illinois; Laurie Rubinow, Shepherd, Finkelman, Miller & Shah, LLP, Chester, Connecticut; Nathan C. Zipperian, Shepherd, Finkelman, Miller & Shah, LLP, Ft. Lauderdale, Florida, *for Plaintiffs-Appellants.*

KENNETH M. KLIEBARD (*with* Gregory T. Fouts, *on the brief*), Morgan Lewis & Bockius LLP, Chicago, Illinois, *for Defendants-Appellees.*

DENNIS JACOBS, *Circuit Judge*:

Seven former participants in online discount membership programs allege violation of federal privacy statutes and a racketeering conspiracy between online retailers and loyalty club businesses to defraud customers of "membership fees" for rewards programs they unwittingly joined. They allege that Trilegiant Corporation ("Trilegiant") conspired with e-merchant retailers such as Buy.com, Orbitz, and Priceline to enroll the retailers' customers in the membership programs via deceptive post-transaction marketing and datapass techniques. We conclude that, because the appellants fail to raise a material issue of fact as to whether they consented to enrollment in the membership programs, the prohibitions of the Electronic Communications Privacy Act do not apply; and because the appellants identify no actionable fraud, they cannot proceed on a theory of racketeering.

The judgment of the district court is affirmed.

# I

The post-transaction marketing employed by Trilegiant and its e-merchant partners functions as follows.   Online merchants such as Buy.com, Inc. and Priceline.com, Inc. enter into an arrangement with Trilegiant to permit the advertisement of membership club programs to their customers.   In the course of completing a transaction, a link, banner, or webpage appears on the e-merchant's website advertising a Trilegiant program.   A customer who selects the link is immediately taken to an enrollment page for a Trilegiant membership product, or the customer may see the Trilegiant enrollment page after completing a purchase on the e-merchant's site, but before reaching the e-merchant's confirmation page.   These enrollment pages purport to offer a coupon or rebate, in addition to a membership in a program that makes available special discount rates on future sales (such as the "Great Fun" program in which plaintiffs enrolled).

The customer is solicited to enter basic personal information, such as a birth date or hometown, and then asked to select "YES" to accept the offer.   The online offer screens disclose, in less conspicuous placement and font, the terms of the program, including billing, renewal, cancellation, and the transfer of data from the e-merchant to Trilegiant.   These terms advise that "[b]y entering my information and clicking 'Yes,' I acknowledge that I have read and agreed to these offer details and Terms & Conditions," including the information transfer. Supp. App. 37; see also App. 67-70.   If the customer opts to participate, the e-merchant seamlessly shares the customer's credit card and personal identifying information with Trilegiant to complete the enrollment.   This exchange is a "datapass."   Supp. App. 35.   The customer is then billed monthly to that credit card (between $10 and $20 per month) until the customer cancels the membership, an internet sale technique termed "negative option billing." Trilegiant follows up after enrollment with confirmation emails welcoming the customer to the program and providing again the full list of terms and conditions.   When the customer calls in to cancel the membership, Trilegiant's call center engages in "refund mitigation," a customer retention strategy.

The plaintiffs allege that they did not consent to join any membership clubs, and that they were duped by techniques of post-transaction marketing, datapass, negative option billing, and refund mitigation into paying for a product that had no apparent value to them. The named plaintiffs testified or declared that: they never agreed to sign up for a membership club with a monthly recurring fee; they did not recall entering any registration information; and they did not recall selecting "YES" to accept the terms and conditions of the program. Supp. App. 40-43. They complain that at no point in the purported transaction did they re-enter their credit card or billing information, and that datapass abets a scam devised by Trilegiant to collect monthly fees without their knowledge.

To snare members, Trilegiant (with the implicit approval of the e-merchant defendants) allegedly designs its enrollment screens to appear as confirmation pages for the legitimate, just-completed transaction, so that the customer is unaware of having registered to buy a new and completely different product. Trilegiant's cancellation and billing process allegedly prolongs the fraud. To cancel a subscription, the customer must first discover the monthly billing on a credit card statement and call Trilegiant's customer service; Trilegiant's representatives then attempt to keep members enrolled as long as possible, either through promotion of the program benefits or delay in the cancellation process.

To evidence intentional deceit, the plaintiffs present: expert witness testimony describing the characteristics of the pages as inherently deceptive; a 2010 congressional report condemning Trilegiant's post-confirmation offer and refund mitigation practices as deceptive and exploitative in 2010;[2] and the testimonials of duped plaintiffs. For example, Debbie Williams testified that she was enrolled in the "Great Fun" program after booking a hotel room on Priceline in 2009. Supp. App. 42. She cancelled her membership in October 2011 after discovering the recurring charges on her bank statements. At her deposition,

---

[2] The report published by a joint committee of the United States Senate condemning Trilegiant's practices led in part to legislation that outlawed *passive* datapass and related conduct. The banned practices are not directly at issue in this lawsuit.

she did not recall ever seeing the offer screen, but also did not deny that she may have selected "YES" or entered her personal information.   Id.   The other named plaintiffs claimed similar experiences.

The plaintiffs initiated a class action in 2010 against Trilegiant and (its parent) Affinion Group LLC.   Their 2012 amended complaint ("the complaint") included claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. Sec. 42-110; the California automatic renewal statute, Cal. Bus. & Prof. Code § 17600 et seq.; and common law unjust enrichment.   The e-merchants and various financial institutions were also added as co-defendants.   In 2014 the district court dismissed the RICO claims, the California state law claims, and most of the CUTPA claims.   Claims against certain defendants were dismissed entirely.   After extensive discovery, the district court granted summary judgment dismissing the ECPA claim and remaining state claims.

On appeal, Plaintiffs challenge only the grant of summary judgment on the ECPA claim, the dismissal of the RICO and RICO conspiracy claims, and the grant of summary judgment on the CUTPA and unjust enrichment claims.

## II

We review *de novo* the grant of summary judgment on the ECPA claim. N.Y. State Rifle and Pistol Ass'n v. Cuomo, 804 F.3d 242, 252 (2d Cir. 2015). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Id. Because the appellants fail to raise a triable issue of fact as to their consent to the alleged interception of electronic communications, we affirm the dismissal of their claim under the ECPA.

The ECPA regulates the interception of an electronic communication.   18 U.S.C. § 2511.   Section 2511(1)(a) states that, except as otherwise provided, anyone who "intentionally intercepts, endeavors to intercept, or procures any

6

other person to intercept or endeavor to intercept, any ... electronic communication" violates the statute.   Id. § 2511(1)(a).   There is a safe harbor for interceptions made with prior consent.   Id. § 2511(2)(d).

The plaintiffs contend that the "datapass" procedure, by which e-merchants share customers' credit card and billing information with Trilegiant without requiring that the customers re-enter that information on the Trilegiant enrollment page, constitutes an unlawful interception of an electronic communication under the ECPA.   The defendants respond that no unlawful interceptions occurred because Trilegiant disclosed the terms of the program, including the transfer of the customer's information, and each plaintiff gave clear and unambiguous consent to those terms.

The defendants made a sufficient showing that the consent exception applies.   The enrollment pages display text informing customers that by entering their name or date of birth and selecting "YES," they authorize the release of information to Trilegiant, including their "name, email address, and credit card or debit card information to Great Fun for enrollment, billing, and benefit processing."   Supp. App. at 6-7, 25.   Defendants submitted evidence demonstrating that only by providing the necessary information and clicking "yes" could an individual actually enroll in one of Trilegiant's programs.   Such affirmative conduct evinces sufficient consent to an interception of an electronic communication.   Other courts have reached the same conclusion on similar facts,[3]  and we ourselves have reached the same conclusion in a summary order

---

[3] See, e.g., In re Vistaprint Corp. Marketing and Sales Practices Litig., MDL No. 4:08-md-1994, 2009 WL 2884727, at *9 (S.D. Tex. Aug. 31, 2009) (dismissing ECPA claim where plaintiffs, "by clicking Yes in the designated spaces on the webpages, authorized VistaPrint to transfer that information" to the "VistaPrint Rewards" program); Berry v. Webloyalty.com, Inc., No. 10-CV-1358-H CAB, 2011 WL 1375665, at *8 (S.D. Cal. Apr. 11, 2011) (in dismissing an ECPA claim over the "Shopper Discounts and Rewards" program, "[t]he Court conclude[d] that Plaintiff Berry's entry of his email address twice and clicking on 'YES' constitute[d] authorization given the several disclosures made on the enrollment

arising under a different statute with a parallel safe harbor provision.  See L.S. v. Webloyalty.com, Inc., 673 F. App'x 100, 106 (2d Cir. 2016) (summary order) (finding same activity to constitute authorization under the Electronic Funds Transfer Act, 15 U.S.C. § 1693e(a)).

The plaintiffs contend that they could not have consented because they have no recollection of giving such authorization or providing their name or date of birth as a passcode on the enrollment screen.  But the plaintiffs do not offer evidence that would permit a reasonable jury to find that they did not take such steps to enroll: the defendants made a prima facie showing of consent by producing evidence that there would be no other way for an individual to enroll in a Trilegiant program, and the plaintiffs' failures of recollection or bare denials offer no support for the alternative theory that Trilegiant somehow obtained the plaintiffs' credit card information and, out of the blue, created unauthorized membership accounts on their behalf.  On this record, there is no material issue of fact on the question of the plaintiffs' consent to the exchange of electronic information among the defendants.

Alternatively, the plaintiffs contend that the inherently deceptive nature of the post-transaction enrollment pages vitiates consent as a matter of law because no reasonable consumer could believe she had consented to join Great Fun.  We are urged to avoid myopic focus on "Trilegiant's miniscule fine print disclosures," and to consider instead "the content and manner of presentation, Plaintiffs' express testimony, and the unrebutted expert evidence submitted which established that Trilegiant designed the 'disclosures' so that they would not be seen or understood."  Appellants' Br. at 43.  Our precedents in Federal Trade Commission and false advertising cases direct us to consider the "entire mosaic" of an advertisement and its ultimate impression on the viewer, as opposed to literal truth or falsity.  F.T.C. v. Sterling Drug, Inc., 317 F.2d 669, 674 (2d Cir. 1963) (cited in Appellants' Br. at 48); see also Ind. Directory Corp. v. F.T.C., 188 F.2d 468, 469-70 (2d Cir. 1951) (cited at 49).  Plaintiffs rely on these

---

page"), vacated and remanded for lack of standing, 507 F. App'x 581 (9th Cir. 2013).

cases and ask us to adopt their logic to the analysis of the Great Fun enrollment page.

Even assuming those precedents bear on the issue of consent as understood in the context of the ECPA, we are unpersuaded. Plaintiffs assert that "the mere presence of an accurate disclaimer does not necessarily cure other potentially misleading statements or representations on a product or advertisement," Delgado v. Ocwen Loan Servicing, LLC, No. 13-CV-4427 (NGG)(RML), 2014 WL 4773991, at *8 (E.D.N.Y. Sep. 24, 2014), and therefore Trilegiant may have perpetrated a fraud despite the presence of disclosures on its enrollment page. But to show that customers may have been misled, the plaintiff must produce evidence that particular statements are deceptive when considered in context. Cf. Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007) (words and images in an advertisement must be "considered in context"); Fink v. Time Warner Cable, 714 F.3d 739, 742 (2d Cir. 2013) ("context is crucial" when reviewing an advertisement's allegedly deceptive text). These plaintiffs have not attempted to do so.[4] This is not a case involving confusing text; instead, the plaintiffs' primary contention is that the appearance of an enrollment offer in the course of a separate e-merchant transaction was itself inherently deceptive because it led customers to believe that Trilegiant's products were associated with or offered by the e-merchant.

---

[4] In deceptive advertising cases proceeding on the plaintiffs' theory, the party identifies the phrases and statements that are alleged to be false or deceptive, and explains why. See, e.g., Bowring v. Sapporo U.S.A., Inc., 234 F. Supp. 3d 388, 389 (E.D.N.Y. 2017) (considering allegations that use of term "imported" on product label was materially misleading in context as it suggested, falsely, that the beer originates from Japan); Sitt v. Nature's Bounty, Inc., 15-CV-4199 (MKB), 2016 WL 5372794, at *1 (E.D.N.Y. Sep. 26, 2016) (reviewing in context claims on label that a product is "natural" and "non-synthetic"); In re Ford Fusion & C-Max Fuel Econ. Litig., No. 13-MD-2450, 2015 WL 7018369, at *33 (S.D.N.Y. Nov. 12, 2015) (noting plaintiffs identified as false "specific ads that made specific promises" about products).

We disagree.   The plaintiffs have not identified any specific representations on the enrollment pages that were misleading; and the appearance of the enrollment pages, without more, is not so confusing so as to permit a jury to find that the plaintiffs did not consent to the plain terms of the membership.   In any event, the plaintiffs' theory that misleading enrollment pages deceived them into believing they were enrolling in something other than a discount club membership is entirely inconsistent with the record evidence that individual plaintiffs were unaware they enrolled in anything to begin with: the plaintiffs testified that they do not recall the enrollment pages; none claims to have read the text on the offer page and found it deceptive; and the marketing expert posits that the page was designed to result in purchases of Trilegiant's services *without awareness of those purchases.*

The plaintiffs' theory, which is unsupported by case law, does not preserve a genuine dispute on the issue of consent.   The district court correctly granted summary judgment on the plaintiffs' ECPA claim.

### III

We review the district court's dismissal of the RICO and the RICO conspiracy claims *de novo*, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiffs.   Schlessinger v. Valspar Corp., 686 F.3d 81, 85 (2d Cir. 2012).   Because the appellants have not properly alleged any predicate acts of actionable fraud, we affirm.

To sustain a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must show "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains and interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."   Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(a)-(c)).   And to state a RICO conspiracy, a plaintiff must allege "the existence of an agreement to violate RICO's substantive provisions."   United States v. Sessa, 125 F.3d 68, 71 (2d Cir. 1997) (internal quotation marks omitted).

10

Section 1961(1) sets forth an exhaustive list of predicate "acts" that can constitute a pattern of "racketeering activity," including section 1341 and 1343 (mail and wire fraud, respectively). The complaint alleges thousands of acts of mail and wire fraud in furtherance of the RICO enterprise and RICO conspiracy, including Trilegiant's billing (by transmitting fraudulent charges on credit card bills), use of telephones (in refund mitigation to preserve fraudulent gains), and use of the internet (to initiate the scheme through post-transaction marketing and datapass).

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000); see 18 U.S.C. §§ 1341, 1343. "The gravamen of the offense is the scheme to defraud." United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 657 (2d Cir. 2016). A "scheme to defraud" is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." Autuori, 212 F.3d at 115 (citing McNally v. United States, 483 U.S. 350, 358 (1987)). To make out such a scheme, a plaintiff must provide proof of a material misrepresentation. Neder v. United States, 527 U.S. 1, 25 (1999).[5]

---

[5] Plaintiffs rely on several Sixth Circuit cases for the proposition that a "scheme to defraud" describes a category of unethical or unfair practices broad enough to capture post-transaction marketing. See United States v. Warshak, 631 F.3d 266, 311 (6th Cir. 2010) ("[T]he scheme to defraud element required under Section 1341 is not defined according to a technical standard. The standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general business life of members of society.'"); see also United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir. 1979). Insofar as the plaintiffs seek to avoid pleading a material misrepresentation in the scheme to defraud, their reliance on Warshak is misplaced. See O'Donnell, 822 F.3d at 657.

In any event, Warshak and Van Dyke are easily distinguishable. In Warshak, the court relied on specific facts that disclosures were not made and products were not properly described: customers were charged unauthorized fees, received "unwanted (and unauthorized) additional shipment[s]," and were

11

The elements of mail and wire fraud must be pled with particularity. See Fed. R. Civ. P. 9(b); Lundy v. Catholic Health Sys. of Long Island, 711 F.3d 106, 119 (2d Cir. 2013); Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999). The complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993); see, e.g., In re Ford Fusion & C-Max Fuel Econ. Litig., 2015 WL 7018369, at *33 (requiring plaintiffs to "sufficiently allege the who, what, when, where, and why of the fraud at issue under Rule 9(b)").

The plaintiffs argue that the district court erred by requiring them to allege specific misrepresentations *in the use of the mail or wires* to satisfy Rule 9(b). Their theory is that even if Trilegiant made otherwise innocent use of the wires, it did so to advance an enterprise that was deceptive overall. E.g., Brewer v. Village of Old Field, 311 F. Supp. 2d 390, 403 (E.D.N.Y. 2004) (While the mailings themselves did not contain misrepresentations, "the complaint allege[d] a close connection between the defendants and the alleged fraudulent scheme" and the mails were "simply used in furtherance of a master plan to defraud.").

True, the mail or wire communications themselves need not contain a false statement. See Schmuck v. United States, 489 U.S. 705, 715 (1989); see also SKS Constructors, Inc. v. Drinkwine, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006) (when alleging use of the mail and wires, "the pleader need only allege that the mail and wire fraud were in furtherance of a larger scheme to defraud" and "the communications themselves need not have contained false or misleading

---

"never informed during the ordering process that they would be charged for anything beyond the shipping-and-handling costs associated with the trial offer." Id. at 312; see also Van Dyke, 605 F.2d at 224. Here, there is no allegation of such explicit deceit: the plaintiffs affirmatively consented to the fully-disclosed terms of the membership club offer, and do not dispute that those terms governed their relationship with Trilegiant.

12

information") (internal quotations marks omitted); <u>Calabrese v. CSC Holdings, Inc.</u>, 283 F. Supp. 2d 797, 808 (E.D.N.Y. 2003) ("a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications" is sufficient to satisfy Rule 9(b)) (internal quotation marks omitted).   But a plaintiff still needs to allege a material misrepresentation as part of the defendants' scheme to fraud to state a violation of section 1341 or 1343. <u>See</u> <u>O'Donnell</u>, 822 F.3d at 657.   That is so notwithstanding characterization of the alleged frauds as predicate acts of a racketeering conspiracy.[6]  The complaint here lacks the particularized allegation of an underlying "scheme to defraud" animated by a material misrepresentation.

For example, the complaint alleges that consumers were "duped into believing" that the membership programs were being offered by an e-merchant, rather than Trilegiant, App'x at 282, but identifies no misrepresentation that induced such a belief.   Similarly, the complaint labels datapass a "fraudulent tactic," <u>id.</u>, and alleges that each time an e-merchant shared a customer's billing information with Trilegiant, both the e-merchant and Trilegiant "committed an act of wire fraud," <u>id.</u> at 308.   But the transfer of billing information from one

---

[6] A valid claim that does not rest on specific misrepresentations in the use of the mails or wires always identifies fraud with particularity at some level of the enterprise.   <u>See, e.g.</u>, <u>Liberty Mut. Ins. Co. v. Blessinger</u>, No. 06 CV 391(NGG)(ARL), 2007 WL 951905, at *7-8 (E.D.N.Y. Mar. 27, 2007) (complaint specified how members of the conspiracy "submitted insurance applications to the plaintiff ... which contained false and incomplete information intended to mislead plaintiff," and "detail[ed] the nature of the false statements"); <u>Wood v. Incorporated Village of Patchogue</u>, 311 F. Supp. 2d 344, 358-60 (E.D.N.Y. 2004) (complaint included allegations that defendants made misrepresentations by submitting annual payroll statements certifying inaccurate information); <u>SKS Construction</u>, 458 F. Supp. 2d at 76-78 (credit card charges and checks did not contain misrepresentations, but the wrongdoing within the conspiracy included "wrongfully endorsed checks payable to XL and then deposited those checks in accounts for himself;" "purchased raw materials on credit while never intending to pay for those materials;" and "fraudulently obtained" credit in others' names).

merchant to another is not inherently fraudulent, and the plaintiffs do not identify any misrepresentation regarding such transfers by Trilegiant or any other defendant.

Neither the complaint's specific discussion of Trilegiant's allegedly deceptive tactics, nor its conclusory references to Trilegiant's fraudulent scheme, set forth a material misrepresentation with the requisite particularity.[7]  Cf. Webloyalty.com, 673 F. App'x at 104 (concluding that Trilegiant's practices at issue in that case not "sufficient to ground [a] fraud claim").  The complaint therefore fails to plead a scheme to defraud.  Without an underlying scheme to defraud, the plaintiffs have not alleged a pattern of racketeering.

The plaintiffs' RICO conspiracy claim fails as well.  The alleged conspiracy involved an agreement to commit the same substantive RICO violations we have deemed insufficiently pled, and the plaintiffs have not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering.  See generally Salinas v. United States, 522 U.S. 52 (1997).  The plaintiffs therefore failed to plead the necessary agreement to violate RICO's substantive provisions.  See Cofacredit S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 245 (2d Cir. 1999).

---

[7] Plaintiffs also rely on Delgado v. Ocwen Loan Servicing for the proposition that the Trilegiant's tactics as alleged are sufficiently deceptive to qualify as a material misrepresentation.  In Delgado, the defendant mailed checks for small amounts of free money together with materials separately disclosing that deposit of the check registers the recipient for an (unwanted and unrelated) service at a steep monthly fee.  2014 WL 4773991, at *1-2.  The Delgado plaintiff's complaint alleged specific material omissions and misrepresentations as to the source of the charges.  Id. at *18-19.  Delgado accurately distinguished the Trilegiant scheme in which "the plaintiffs claimed they were deceptively enrolled in membership programs through the defendants' internet offer pages" but failed to describe any false or fraudulent content.  Id. at *18.

## IV

Finally, we affirm the grant of summary judgment on the CUTPA and unjust enrichment claims substantially for the reasons set forth by the district court.

CUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Sec. 42-110b(a). The plaintiffs allege that Trilegiant's refund mitigation strategy caused them to lose a portion of a possible refund of membership fees. But the plaintiffs, who consented to their original enrollment, have not shown that they are entitled to any such refund. The fact that some plaintiffs were offered less than a full refund to which they would not have been entitled at law cannot constitute an "unfair or deceptive" act.

The district court was likewise correct in granting summary judgment on the unjust enrichment claim. An unjust enrichment claim for membership fees does not lie if the plaintiff freely entered into the membership agreement. The plaintiffs further claim that the refund mitigation technique caused Trilegiant to retain an unfair benefit by offering only partial refunds. But as with their failed CUTPA claim, they cannot argue that Trilegiant was unjustly enriched by not refunding additional, legitimate past membership fees to which its customers were not entitled. See, e.g., Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1070 (9th Cir. 2014) (requiring "unjust retention of [a] benefit" as an element of an unjust enrichment claim).

## CONCLUSION

For the foregoing reasons, we hereby **AFFIRM** the judgment of the district court.

15